******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# IN RE ELIJAH C.*
## (SC 19695)

Rogers, C. J., and Palmer, Eveleigh, McDonald,
Espinosa and Vertefeuille, Js.**

*Syllabus*

The respondent mother appealed from the judgment of the Appellate Court,
which dismissed her appeal from the trial court's judgment terminating
her parental rights with respect to her minor child, E. The trial court
found by clear and convincing evidence, as required by statute (§ 17a-
112 [j] [1]), that the Department of Children and Families had made
reasonable efforts to reunify the respondent and E, and that the respon-
dent was unable to benefit from those efforts. In dismissing the respon-
dent's appeal as moot, the Appellate Court concluded that the respon-
dent had inadequately briefed her claim that the trial court's finding
that she was unable to benefit from the department's reunification efforts
was clearly erroneous, and, because the trial court's judgment could be
sustained on the basis of either that finding or the court's finding that
the department had made reasonable reunification efforts, the Appellate
Court could afford the respondent no practical relief on appeal. On the
granting of certification, the respondent appealed to this court, claiming,
inter alia, that the Appellate Court improperly determined that her appeal
was moot and that the trial court incorrectly determined that she had
been unable to benefit from the department's reunification efforts. *Held*:

1. This court could not conclude that the respondent's challenge to the trial
court's finding that she was unable to benefit from the department's
reunification services was inadequately briefed in the Appellate Court,
and, therefore, that court improperly dismissed the respondent's appeal
as moot; although the respondent's argument regarding that finding was
not comprehensive, cited no authority apart from the applicable statutes
and rules of practice, failed to address certain evidence that strongly
supported that finding, and was relegated to the section of her brief
contesting the finding regarding whether the department's reunification
efforts were reasonable, her claim was reasonably discernable from the
record and sufficiently clear to permit the Appellate Court to address
it on the merits, in light of the relative simplicity and interdependence
of the respondent's briefed claims regarding the trial court's finding
regarding the reasonableness of the department's reunification efforts,
the impact that the department's alleged reduction of its reunification
services had on the success of the respondent's reunification efforts,
and the department's failure to provide the reunification services that
the trial court previously had determined were reasonable and appro-
priate in view of the respondent's cognitive deficits.

2. The respondent could not prevail on her claim that the trial court incor-
rectly determined that she had been unable to benefit from the depart-
ment's reunification efforts because, several months before the termi-
nation hearing, the department reduced the number of the respondent's
weekly visits with E and replaced the agency tasked with supervising
one of those weekly visits with an agency whose employees were not
trained to work with persons with cognitive disabilities, such as the
respondent, and because the department could have done more to iden-
tify services that might have assisted her in her reunification efforts:
the evidence supported the trial court's finding that that the respondent
was unable to benefit from the department's reunification efforts, the
trial court having properly relied on the expert opinion testimony of
two evaluating psychologists that the respondent's cognitive deficits
and psychological conditions were so severe that she could not be left
alone with children and that the only way reunification could be achieved
was through a program involving around-the-clock supervision of both
the respondent and E, which was not available in this state; moreover,
this court declined to address the respondent's claim that the department
should have looked out of state to find a program that could provide
around-the-clock supervision, she having failed to raise that claim in
the trial court, and, in any event, the respondent cited no authority to

support her claim that reasonable reunification efforts required the department to provide her with in-state or out-of-state around-the-clock supervision.

The role that the Americans with Disabilities Act of 1990 (42 U.S.C. § 12101 et seq.), the provisions of which cannot be relied on as a defense in a child neglect or termination of parental rights proceeding, plays in child welfare proceedings, discussed.

Argued January 17—officially released August 9, 2017***

*Procedural History*

Petition by the Commissioner of Children and Families to terminate the respondents' parental rights as to their minor child, brought to the Superior Court in the judicial district of Windham, Child Protection Session at Willimantic, and tried to the court, *Hon. Francis J. Foley III*, judge trial referee, who, exercising the powers of the Superior Court, rendered judgment terminating the respondents' parental rights, from which the respondent mother appealed to the Appellate Court, *DiPentima*, *C. J.*, and *Beach* and *Flynn, Js.*, which dismissed the appeal for lack of subject matter jurisdiction, and the respondent mother, on the granting of certification, appealed to this court. *Improper form of judgment*; *judgment directed*.

*James P. Sexton*, assigned counsel, with whom were *Michael S. Taylor*, assigned counsel, and, on the brief, *Emily Graner Sexton*, *Matthew C. Eagan* and *Marina L. Green*, assigned counsel, for the appellant (respondent mother).

*Michael Besso*, assistant attorney general, with whom, on the brief, were *George Jepsen*, attorney general, and *Benjamin Zivyon*, assistant attorney general, for the appellee (petitioner).

*Dan Barrett*, *Daniel J. Krisch*, and *Shira T. Wakschlag* filed a brief for the Arc of the United States et al. as amici curiae.

*Joshua Michtom*, assistant public defender, filed a brief for the Office of the Chief Public Defender as amicus curiae.

*Opinion*

PALMER J. In this certified appeal, the respondent, Marquita C., appeals from the judgment of Appellate Court, which dismissed her appeal from the judgment of the trial court terminating her parental rights as to her son, Elijah C.[1] See *In re Elijah C.*, 164 Conn. App. 518, 519, 137 A.3d 944 (2016). The respondent claims that the Appellate Court incorrectly concluded that she had failed to adequately brief one of the two independent grounds for reversing the judgment of the trial court and, consequently, that her appeal was moot. She further claims that the trial court incorrectly determined, first, that the Department of Children and Families (department) made reasonable efforts to reunify her with Elijah and, second, that she was unable to benefit from those efforts.[2] We agree with the respondent that the Appellate Court improperly dismissed her appeal as moot. We further conclude, however, that the evidence supports the trial court's determination that the respondent was unable to benefit from reunification efforts. Because our resolution of that issue constitutes an independent basis for affirming the trial court's judgment, we need not address the respondent's claim that the trial court incorrectly concluded that the department made reasonable efforts to reunify her with Elijah. We therefore vacate the judgment of the Appellate Court and remand the case to that court with direction to affirm the trial court's judgment.[3]

The opinion of the Appellate Court sets forth the following relevant facts and procedural history. "The [trial] court granted the petitioner, the Commissioner of Children and Families, an ex parte order of temporary custody of Elijah shortly after he was born.[4] The petitioner filed a neglect petition on February 21, 2014, on the basis of the doctrine of predictive neglect as a result of the respondent's diminished cognitive abilities.[5] The order granting temporary custody of Elijah was sustained four days later.

"The court, *Dyer, J.*, held a neglect trial on September 15, 2014. On October 2, 2014, the court adjudicated Elijah as neglected and ordered his care, custody, and guardianship [be] committed to the petitioner. Additionally, the court ordered the department (1) to contact [the Department of Mental Health and Addiction Services (DMHAS) and the Department of Developmental Services (DDS)] to inquire about additional services for the respondent, (2) to ascertain from those agencies whether a group home existed where the respondent could potentially be reunified with Elijah and receive various forms of instruction, (3) to request the behavioral health center that was providing the respondent with psychotropic medications to conduct a medication management review, and (4) to file a written report with the court addressing various issues.

"On November 4, 2014, the petitioner filed a motion for review of the permanency plan seeking to terminate the parental rights of the respondent. Judge Dyer held a trial on January 22, 2015, and, six days later, the court issued its memorandum of decision. After considering the evidence presented, the court concluded that it was in the best interest of Elijah . . . '[to afford the respondent] . . . a limited period of additional time to pursue reunification efforts,' namely, to continue with the services provided by the department. . . . The time period, the court believed, 'should not exceed six or seven months.' [Accordingly], the court rejected the department's permanency plan of termination of parental rights.

"On February 24, 2015, the petitioner filed a petition pursuant to General Statutes § 17a-112[6] to terminate the parental rights of the respondent and Paul Y. . . . On September 8 and 10, 2015, the court, *Hon. Francis J. Foley III*, judge trial referee, held a hearing on the . . . petition.[7] On September 18, 2015, the court issued a comprehensive memorandum of decision. The court found by clear and convincing evidence that '[the department had] made reasonable efforts to reunify [Eliljah] with [the respondent] . . . [and that the respondent was] unable to benefit from reunification services.' Consequently, the court terminated the parental rights of the respondent. . . .

"The court's memorandum of decision from the termination hearing sets forth the following facts . . . . Shortly after Elijah was born, the hospital personnel were concerned because the respondent 'appeared to have cognitive limitations and serious mental health problems (schizophrenia) and . . . was reported to have poor judgment and no insight into parenting.' Thus, the hospital contacted the department, [which] sent a social worker to observe the respondent and Elijah. The social worker concluded that the respondent could not care for Elijah because of the severity of her limitations.

"The respondent's lengthy and exceptionally sad involvement in the child welfare system provides . . . context to the present appeal. The respondent was born prematurely, addicted to cocaine and alcohol, and suffered serious medical conditions. In April, 1989, the respondent was placed in foster care with Gwendolyn C. and [Gwendolyn's] . . . husband. In 1993, Gwendolyn and her . . . husband adopted the respondent and another girl unrelated to the respondent. In 1994, the respondent's adoptive parents divorced. Between 1997 and 1999, Gwendolyn adopted three more children.

"The respondent's childhood with Gwendolyn was difficult. Under her care, the respondent and the other children were 'cruel[ly] discipline[d] . . . [by her] making them run up and down stairs, standing them

on one leg with their arms outstretched holding a book in each arm, [and] beating [them] with a stick and with a belt.' In July, 2001, just prior to the respondent's thirteenth birthday, Gwendolyn abandoned three of her adoptive children, including the respondent, at the department's Meriden office. Gwendolyn explained that she could no longer care for [them]. All three children were underweight, which lent credence to claims that Gwendolyn routinely withheld food from [them].

"After being abandoned by Gwendolyn, the respondent remained in the custody of the petitioner as a committed child for approximately six years. The respondent qualified for postmajority services through [DDS] and [DMHAS]. The department developed a postmajority plan in which both agencies were to provide the respondent with 'life skills, vocational training, and supportive housing.' The postmajority plan, however, never came to fruition because, prior to her nineteenth birthday, the respondent returned to Gwendolyn's care. The respondent resided with Gwendolyn for the next several years before cohabitating with Paul Y. After the respondent and Paul Y.'s relationship ended, she returned to Gwendolyn's home. Approximately four months later, Elijah was born.

"The court's memorandum of decision also detailed the department's efforts to reunite Elijah with the respondent. It noted that the department offered the respondent case management services, three in-home visits per week with a parenting skills component, the opportunity to attend Elijah's medical visits by providing transportation, and services from two agencies [namely, Nurturing Seeds and Family Network] to provide supervised visitation and training in basic childcare skills. Concerned that the respondent was 'being overwhelmed with too many services,' the department sought and was granted permission for the respondent to undergo psychological evaluations.

"The respondent underwent two psychological evaluations that informed the court's decision. The first evaluation, conducted by Madeleine Leveille, a licensed psychologist, was completed in August, 2014, prior to the neglect trial. In addition to providing the court with the respondent's background, Leveille's evaluation [contained] key observations and opinions. For example, when discussing her mental illness, the respondent told Leveille that she regularly saw a 'shadow,' which Leveille characterized as a visual hallucination. Leveille concluded that the respondent had a 'limited conceptual understanding, [was] highly dependent socially on others, and [had] odd and occasionally paranoid and cynical thought processes.' Moreover, the respondent's 'thinking processes show[ed] clear evidence of her [i]ntellectual [d]isability, [s]chizophrenia and a mood disorder.' Leveille was unequivocal that '[h]aving an [i]ntellectual [d]isability does not mean that one cannot

parent a child. In [the respondent's] case, however, her intellectual disability, coupled with her psychiatric conditions, particularly her personality disorder, render[ed] her incapable of parenting a child independently.'

"Approximately two months before the termination trial, in July, 2015, the respondent underwent a second evaluation. This evaluation was funded by the department in an effort to assess the respondent on an 'individualized basis.' The 'Cognitive/Adaptive Functioning Evaluation' was conducted by Stephanie Stein Leite, a licensed psychologist. Leite concluded that the respondent had an [intelligence] quotient that placed her in the '[e]xtremely [l]ow range,' i.e., at the 'bottom [one] percentile of the [population] . . . .' Leite's evaluation also concluded that the respondent's personal and social skills, adaptive behavior, [and] ability to perform daily living skills . . . were in the [1] percent range, i.e., '[99 percent] of the population [have] better adaptive functioning skills than . . . [the respondent].' Leite's assessment indicated that the respondent's 'eating, dressing, and hygiene skills [were] commensurate with [those of] a six year old . . . [that] [s]he complete[d] household chores at the level of an eleven year old, and use[d] time, money, and communication tools at the level of a [thirteen] year old.' In short, Leite's evaluation demonstrated that the respondent, pursuant to General Statutes § 1-1g,[8] was intellectually disabled. On the basis of these results, Leite opined that the respondent was 'unlikely to be able to independently care for herself, which means she [would] not [be] able to care for [Elijah]. Because many of [the respondent's poor adaptive skills were] rooted in her lower intellectual functioning, though she is educable, the deficits are not, overall, likely to be responsive to remediation.' Leite concluded that the respondent could only care for Elijah if the respondent was under someone's care." (Footnotes altered.) *In re Elijah C.*, supra, 164 Conn. App. 520–25.

Although well aware of the respondent's love for Elijah and the fact that her parenting deficiencies are due to extremely unfortunate circumstances not of her own making, the trial court concluded in relevant part that, "[r]egrettably, [the respondent's] condition is such" that "[s]he is not able to care for a child by herself and would require twenty-four hour assistance by a surrogate parent or a group home with the capacity to monitor [her] day and night" for her "to achieve any form of reunification. There are no known, available support programs that offer that level of care." And "[t]here is no doubt that [the respondent] and even [Gwendolyn] love Elijah. 'The sad fact is there is a difference between parental love and parental competence.' *In re Christina*, 90 Conn. App. 565, 575 [877 A.2d 941] (2005) [aff'd, 280 Conn. 474, 908 A.2d 1073 (2006)]. There is abundant evidence that [the respondent] is only marginally able to care for herself."

On appeal to the Appellate Court, the respondent claimed that the trial court incorrectly determined that the department had made reasonable efforts to reunite her with Elijah when, within two weeks of the trial court's January 28, 2015 order directing the department to continue the services it was then providing to the respondent, the department "removed one of the services that was most crucial to her progress . . . ." *In re Elijah C.*, Conn. Appellate Court Briefs & Appendices, February Term, 2016, Respondent's Brief p. 8. More specifically, the respondent argued that the department had reduced the number of weekly supervised visits from three to two and had changed the agency responsible for supervising one of the visits from Nurturing Seeds, whose employees were trained to work with people with cognitive disabilities, to Family Network, whose employees were not.[9] See id., pp. 7–8. In the respondent's view, those actions by the department deprived the trial court of the information necessary to determine whether she, in fact, was unable to benefit from reunification services. Thus, the respondent claimed that, "[b]ecause [Judge Dyer], on January 28, 2015, defined reasonable efforts [to reunite the respondent and Elijah] for the petitioner, and because the department acted in opposition to that order, [Judge Foley's] subsequent holding that . . . clear and convincing evidence showed that the petitioner made reasonable efforts and that the respondent was unable to benefit from [them] is clearly erroneous." Id., p. 11.

The petitioner maintained, inter alia, that the respondent's appeal must be dismissed as moot because, as we explained in *In re Jorden R.*, 293 Conn. 539, 552–53, 979 A.2d 469 (2009), either one of the trial court's findings—that the department made reasonable reunification efforts or that the respondent was unable to benefit from them—was sufficient to sustain the trial court's judgment, but, in her brief to the Appellate Court, the respondent had challenged only one of those findings. See *In re Elijah C.*, supra, 164 Conn. App. 525. Consequently, the petitioner argued, the respondent could not obtain any practical relief on appeal because the Appellate Court was bound to affirm the trial court's judgment on the basis of that court's unchallenged finding that the respondent was unable to benefit from reasonable reunification efforts. See id.; see also *In re Jorden R.*, supra, 555–57. The Appellate Court agreed with the petitioner, concluding that the respondent had inadequately briefed her claim challenging the trial court's finding that the respondent was unable to benefit from reunification efforts. *In re Elijah C.*, supra, 526. The Appellate Court stated that, "[a]lthough the respondent's main brief does use language suggesting a challenge to the court's second finding, the argument was far from complete, lacking legal authority and analysis. As a result, the respondent ha[d] failed to adequately brief any challenge [to] the court's second

finding that she was unable to benefit from the reunification efforts." Id., 529. The court further explained that, to the extent that the respondent's brief could be read as challenging the trial court's second finding, the argument consisted of a mere seven sentences and was improperly located in the section of the respondent's brief addressing her claim that the trial court incorrectly determined that the department made reasonable reunification efforts. See id., 529 and n.6. This certified appeal followed. Additional facts and procedural history will be set forth as necessary.

On appeal, the respondent claims that the Appellate Court incorrectly determined that her appeal was moot. She further claims that the department's reunification efforts failed to comport with the Americans with Disabilities Act of 1990 (ADA), Pub. L. No. 101-336, 104 Stat. 327, codified as amended at 42 U.S.C. § 12101 et seq. (2012)[10] and, therefore, that the trial court's finding that those efforts were reasonable for purposes of § 17a-112 (j) (1) is clearly erroneous. Finally, the respondent argues that the trial court incorrectly determined that she was unable to benefit from reunification efforts. We agree with the respondent that the Appellate Court incorrectly determined that her appeal was moot. We agree with the petitioner, however, that the record supports the trial court's finding by clear and convincing evidence that the respondent was unable to benefit from reunification efforts, which serves as an independent basis for sustaining the judgment of the trial court. In light of our determination, we need not decide whether the trial court correctly determined that the department's reunification efforts were reasonable.

I

We first address the respondent's claim that the Appellate Court incorrectly determined that her appeal was moot. "Mootness raises the issue of a court's subject matter jurisdiction and is therefore appropriately considered even when not raised by one of the parties. . . . Mootness is a question of justiciability that must be determined as a threshold matter because it implicates [a] court's subject matter jurisdiction . . . . Because courts are established to resolve actual controversies, before a claimed controversy is entitled to a resolution on the merits it must be justiciable. Justiciability requires (1) that there be an actual controversy between or among the parties to the dispute . . . (2) that the interests of the parties be adverse . . . (3) that the matter in controversy be capable of being adjudicated by judicial power . . . and (4) that the determination of the controversy will result in practical relief to the complainant. . . . [I]t is not the province of appellate courts to decide moot questions, disconnected from the granting of actual relief or from the determination of which no practical relief can follow. . . . In determining mootness, the dispositive question

is whether a successful appeal would benefit the plaintiff or defendant in any way." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *In re Jorden R.*, supra, 293 Conn. 555–56.

In concluding that the appeal was moot, the Appellate Court relied on *In re Jorden R.*; see *In re Elijah C.*, supra, 164 Conn. App. 526–28; in which this court determined that, "[a]s part of a termination of parental rights proceeding, § 17a-112 (j) (1)[11] requires the department to prove by clear and convincing evidence that it has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds . . . that the parent is unable or unwilling to benefit from reunification efforts . . . .

"Because the two clauses are separated by the word unless, [§ 17a-112 (j) (1)] plainly is written in the conjunctive. Accordingly, the department must prove either that it has made reasonable efforts to reunify or, alternatively, that the parent is unwilling or unable to benefit from reunification efforts. Section 17a-112 (j) clearly provides that the department is not required to prove both circumstances. Rather, either showing is sufficient to satisfy this statutory element." (Emphasis omitted; footnote added.) *In re Jorden R.*, supra, 293 Conn. 552–53.

Accordingly, we concluded in *In re Jorden R.* that when, as in the present case, the trial court finds that the department has proven both statutory elements— the department made reasonable reunification efforts and the respondent was unable to benefit from them— the respondent's failure to challenge both findings on appeal renders the appeal moot because either one constitutes an independent, alternative basis for affirming the trial court's judgment. Id., 557 (no practical relief can be afforded to parent who fails to challenge both findings because "trial court's ultimate determination that the requirements of § 17a-112 [j] [1] were satisfied remain unchallenged and intact").

The Appellate Court relied on these principles in concluding that the respondent's appeal was moot because she had failed to adequately brief her claim that the trial court's second finding was clearly erroneous. See *In re Elijah C.*, supra, 164 Conn. App. 526–29; see also *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control*, 266 Conn. 108, 120, 830 A.2d 1121 (2003) (appellate courts "are not required to review issues that have been improperly presented . . . through an inadequate brief" [internal quotation marks omitted]). We review the Appellate Court's determination that a claim was inadequately briefed for an abuse of discretion. E.g., *State* v. *Buhl*, 321 Conn. 688, 724–25, 138 A.3d 868 (2016).

Notwithstanding this deferential standard of review, we are unable to conclude that the respondent's claim

challenging the trial court's second finding was inadequately briefed. To be sure, the respondent's argument was neither comprehensive nor painstaking, cited no authority, apart from the applicable statutes and rules of practice, and was relegated to the section of her brief contesting the trial court's finding that the department made reasonable efforts to reunite her with Elijah. Nonetheless, the extent of the briefing required to ensure that a claim will be reviewed by this court or the Appellate Court is highly dependent on the nature of the claim being asserted, such that the more nuanced and complex the claim, the more extensive the required analysis. See, e.g., id., 726 (citing cases and explaining that analytical complexity of claim generally dictates nature of briefing required). Ordinarily, "[c]laims are inadequately briefed when they are merely mentioned and not briefed beyond a bare assertion. . . . Claims are also inadequately briefed when they . . . consist of conclusory assertions . . . with no mention of relevant authority and minimal or no citations from the record . . . ." (Citation omitted; internal quotation marks omitted.) *Electrical Contractors, Inc.* v. *Dept. of Education*, 303 Conn. 402, 444 n.40, 35 A.3d 188 (2012). As a general matter, the dispositive question in determining whether a claim is adequately briefed is whether the claim is "reasonably discernible [from] the record . . . ." (Internal quotation marks omitted.) *McCook* v. *Whitebirch Construction, LLC*, 117 Conn. App. 320, 322 n.3, 978 A.2d 1150 (2009), cert. denied, 294 Conn. 932, 987 A.2d 1029 (2010). We agree with the respondent that her challenge to the trial court's second finding in the Appellate Court satisfied this standard, albeit minimally.

The respondent's claims in the Appellate Court, which she viewed as inextricably linked, were straightforward. The respondent argued, first, that the trial court's finding that the department made reasonable efforts to reunite her with Elijah was clearly erroneous because, inter alia, shortly after the trial court issued its January 28, 2015 order directing the department to continue the services it was then providing to the respondent, the department eliminated one of the services that the respondent considered most crucial to the success of her reunification efforts. See *In re Elijah C.*, Conn. Appellate Court Briefs & Appendices, supra, Respondent's Brief p. 8. In a closely related vein, the respondent further argued that the trial court's finding that she could not benefit from reunification efforts was clearly erroneous in light of the department's failure to provide the reunification services that the trial court previously had determined were reasonable and appropriate in light of the respondent's cognitive deficits, and that the court had ordered be continued for a period not to exceed six or seven months so that it could better determine whether the respondent was able to benefit from them.[12] See id, pp. 9–10. Considering the relative

simplicity and interdependence of these claims, we believe, contrary to the determination of the Appellate Court, that the respondent's second claim was sufficiently clear to permit that court to address it on the merits.[13]

We disagree with the petitioner that the respondent's second claim was inadequately briefed because the respondent's argument failed to take into account the evidence that supported the trial court's finding that she was unable to benefit from reunification services. As we explain more fully hereinafter, the petitioner is correct that the respondent, in addressing her second claim, failed to address certain evidence that strongly supported the trial court's second finding. We have never held, however, that an appellant's failure to consider every countervailing argument renders a claim inadequately briefed. Of course, in the interests of effective advocacy, an appellant should address both the strengths and weaknesses of her case, but we cannot say that the failure to do so necessarily renders the claim inadequately briefed.

Nor are we persuaded by the petitioner's contention that the respondent's claim was inadequately briefed because she failed to address the holding of *In re Jorden R.*, which the petitioner maintains "rejected" the logic underlying the respondent's second claim, namely, "that, without the department first providing reasonable [services], a trial court's finding that [the respondent] was unable to benefit from [such services] must necessarily fail." We disagree with the petitioner's characterization of the respondent's claim in the Appellate Court. The respondent did not claim in that court that the department's failure to provide reunification services necessarily precludes a finding by the trial court that a parent is unable to benefit from such services. To the contrary, the respondent acknowledges that, in some cases, the department may be under no obligation to pursue a permanency plan of reunification. The respondent argued, rather, that, in light of the department's failure to provide the services that the trial court previously had determined were reasonable in light of the respondent's disabilities and necessary for a determination of whether reunification was feasible, that court's finding that she was unable to benefit from such services was not supported by the evidence.

Accordingly, although it is true that a finding that the department made reasonable reunification efforts is not a necessary predicate to a finding that a parent is unable to benefit from such efforts, this does not mean that a trial court could never view those two issues as interrelated. Cf. *In re Gabriella A.*, 319 Conn. 775, 814, 127 A.3d 948 (2015) (*Robinson, J.*, dissenting) ("[T]he question of whether the petitioner made reasonable efforts to reunify the respondent with her child is inextricably linked to the question of whether the respondent can

benefit from such efforts. Because the petitioner's efforts were unreasonable, we cannot determine whether the respondent could have benefited from reasonable efforts." [Emphasis omitted; footnote omitted.]). Nothing that we stated in *In re Jorden R.* suggests otherwise. Depending on the case, a trial court might well conclude that the department's reunification efforts were so lacking as to preclude both a finding that the department made reasonable reunification efforts *and* that a parent is unable to benefit from such efforts. Cf. *In re Fried*, 266 Mich. App. 535, 541, 702 N.W.2d 192 (2005) (reasonableness of reunification efforts affects sufficiency of evidence supporting grounds for termination). Although the respondent believed in good faith that this is such a case and tailored her arguments accordingly, as we explain hereinafter, we disagree with the merits of the respondent's view of that issue.

II

We turn, therefore, to the respondent's claim that the trial court incorrectly determined that she was unable to benefit from reunification efforts. As we have explained, the respondent views the success of this claim as dependent on the success of her claim that the trial court incorrectly determined that the department made reasonable efforts to reunite her with Elijah. Specifically, the respondent argues that the trial court incorrectly determined that she was unable to benefit from reunification services because, seven months before the termination hearing, the department reduced the number of the respondent's weekly visits with Elijah from three to two and replaced the agency tasked with supervising one of the visits, Nurturing Seeds, with Family Network, whose employees, in contrast to the employees of Nurturing Seeds, were not trained to work with clients with cognitive disabilities. The respondent maintains that, because the evidence indicates that her parenting skills were improving under Nurturing Seeds, the only reasonable conclusion to be drawn is that her skills would have continued to improve but for the department's substitution of agencies. The respondent also faults the department for failing to do more to identify services that might have assisted her in her reunification efforts.

The petitioner counters that there is no evidence that the change from Nurturing Seeds to Family Network had any adverse effect on the respondent's reunification efforts. To the contrary, the petitioner maintains that the only evidence related to this issue indicates that the services provided by the two agencies were indistinguishable in terms of outcomes. The petitioner further argues that the respondent does not identify a single available reunification service that the department failed to offer her, and, therefore, her assertion that the department could have done more to assist her in her

reunification efforts is entirely speculative. Finally, the petitioner contends that, even if the respondent is correct that the department's reunification efforts were somehow lacking, she nonetheless cannot prevail because the evidence overwhelmingly supports the trial court's determination that she was unable to benefit from reunification services, regardless of what services were provided or how long they were provided for. We agree with the petitioner.

The following principles guide our analysis of this claim. "Pursuant to § 17a-112 (j), the trial court must make certain required findings after a hearing before it may terminate a party's parental rights. It is well established that, [u]nder § 17a-112, a hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more of the . . . grounds for termination of parental rights set forth in § 17a-112 [(j) (3) exist] by clear and convincing evidence. . . . In contrast to custody proceedings, in which the best interests of the child are always the paramount consideration and in fact usually dictate the outcome, in termination proceedings, the statutory criteria must be met before termination can be accomplished and adoption proceedings begun. . . . Section [17a-112 (j) (3)] carefully sets out . . . [the] situations that, in the judgment of the legislature, constitute countervailing interests sufficiently powerful to justify the termination of parental rights in the absence of consent. . . . If the trial court determines that a statutory ground for termination exists, then it proceeds to the dispositional phase. During the dispositional phase, the trial court must determine whether termination is in the best interests of the child." (Footnote omitted; internal quotation marks omitted.) *In re Oreoluwa O.*, 321 Conn. 523, 531–32, 139 A.3d 674 (2016). "Also, as part of the adjudicatory phase, the department is required to prove, by clear and convincing evidence, that it has made reasonable efforts . . . to reunify the child with the parent, unless the court finds . . . that the parent is unable or unwilling to benefit from reunification . . . ." (Internal quotation marks omitted.) Id., 532. "Because a respondent's fundamental right to parent his or her child is at stake, [t]he statutory criteria must be strictly complied with before termination can be accomplished and adoption proceedings begun." (Internal quotation marks omitted.) *In re Elvin G.*, 310 Conn. 485, 500–501, 78 A.3d 797 (2013).

On appeal, we evaluate the trial court's subordinate factual findings for clear error. E.g., *In re Gabriella A.*, supra, 319 Conn. 789. We review the trial court's ultimate determination that a parent is unable to benefit from reunification efforts, however, for evidentiary sufficiency; e.g., id., 790; "that is, we consider whether the trial court could have reasonably concluded, [on the

basis of] the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ultimate conclusion]. . . . When applying this standard, we construe the evidence in a manner most favorable to sustaining the judgment of the trial court." (Internal quotation marks omitted.) Id., 789.

Although the trial court made numerous findings in deciding to terminate the respondent's parental rights, two in particular, either alone or in combination, support that court's determination that the respondent was unable to benefit from reunification services. First, as we previously discussed, the trial court credited the opinions of Leveille and Leite, the two psychologists who evaluated the respondent at different stages of the case, that the respondent's cognitive deficits and psychological conditions were so severe that the only way that reunification could be achieved would be if the respondent and Elijah lived in a setting in which they both received around-the-clock supervision. See, e.g., *In re Shane M.*, 318 Conn. 569, 590, 122 A.3d 1247 (2015) ("[c]ourts are entitled to give great weight to professionals in parental termination cases" [internal quotation marks omitted]); *In re Juvenile Appeal (Anonymous)*, 177 Conn. 648, 667, 420 A.2d 875 (1979) (in termination proceeding, "[p]sychological testimony from professionals is rightly accorded great weight"). It was for this reason that the trial court, following the neglect hearing, ordered the department to contact DMHAS and DDS to ascertain whether there were any assisted living programs in Connecticut that provided the level of care that the respondent needed for a permanency plan of reunification to proceed. The department subsequently communicated with staff from both agencies, who informed the department that there were no such programs in the state.[14]

The trial court also relied on the fact that, three months before the termination hearing, the respondent was hospitalized for eight days following a period of "homicidal ideation toward her mother, mood swings, auditory hallucinations and visions of hitting others in the head with a hammer and enjoying it," a development that the court aptly described as a "significant safety concern" for Elijah. The court further observed that the respondent's hospital admission form indicated that she had been "aggressive toward her three year old nephew on the day prior to [her] admission," and that the respondent's adoptive mother, Gwendolyn, had testified "that [the respondent was] not allowed unsupervised contact with [any of Gwendolyn's] twelve grandchildren." The court concluded that, "[a]s this ha[d] only recently occurred, it [was] unlikely that [the respondent's] anger toward her mother and aggression toward [her] nephew [had] been addressed in therapy."

It bears emphasis, moreover, as it relates to the trial

court's finding that the respondent was unable to benefit from reunification services, that, at the time of her June, 2015 hospitalization, the respondent had been receiving reunification services, including individual counseling and psychotropic medication management services, for fifteen months and yet was still experiencing hallucinations and had not progressed to a point at which she could be left alone with children. Subsequently, approximately two months before the termination hearing, Leite conducted a court ordered "Cognitive/Adaptive Functioning Evaluation" of the respondent. (Internal quotation marks omitted.) *In re Elijah C.*, supra, 164 Conn. App. 524. In her report, which the trial court credited, Leite stated that the respondent "continued to have visual and auditory hallucinations," which "likely impacts her ability to tolerate stressful situations, such as when a baby cries, and her ability to engage in creative problem solving, as both the psychoticism and the mental retardation make it difficult [for her] to extrapolate learned information to new situations." In light of these and other facts, the trial court reasonably concluded by clear and convincing evidence that the respondent, albeit through no fault of her own, was simply unable to benefit from reunification services to the extent required for her reunification with Elijah.

Notably, the respondent does not address the trial court's findings regarding the events preceding her June, 2015 hospitalization, much less explain why those findings do not support that court's determination that she was ultimately unable to benefit from reunification services. Moreover, the respondent's only response to the trial court's finding that there were no assisted living programs in this state that offered the level of care and supervision that she and Elijah would require for reunification efforts to proceed is to argue, for the first time on appeal, that the petitioner should have looked out of state to find such a program. We agree with the petitioner that the proper place for the respondent to have raised her claim concerning an out-of-state placement was in the trial court, where the issue could have been litigated and a factual record developed as to whether reasonable reunification efforts required the department to search for an out-of-state placement. E.g., *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 142, 84 A.3d 840 (2014) ("[i]t is well settled that [o]ur case law and rules of practice generally limit [an appellate] court's review to issues that are distinctly raised at trial" [internal quotation marks omitted]). In the absence of such a record, we can only speculate as to whether such a program existed, what it would have cost or whether the respondent even would have agreed to participate in it.[15]

We note, finally, that, even if the respondent's claim concerning an out-of-state placement had been preserved, the respondent cites no authority for the propo-

sition that reasonable reunification efforts required the department to provide her with around-the-clock parenting assistance—in state or out of state. To our knowledge, only one court has considered such a claim, and that court flatly rejected it. See *In re Terry*, 240 Mich. App. 14, 27–28, 610 N.W.2d 563 (2000) ("[The] [p]etitioner had no other services available that would address [the] respondent's deficiencies while allowing her to keep her children. The ADA does not require [the] petitioner to provide [the] respondent with full-time, live-in assistance with her children. See *Bartell* v. *Lohiser*, 12 F. Supp. 2d 640, 650 [E.D. Mich. 1998 (claim that ADA required state to provide in-home assistance to mentally disabled mother to care for her son was unsupported by law), aff'd, 215 F.3d 550 (6th Cir. 2000)]. [The] [r]espondent's contention that she needed even more assistance from [the] petitioner to properly care for her children merely provides additional support for the family court's decision to terminate her parental rights."); accord *In re Ozark*, Michigan Court of Appeals, Docket No. 256851 (December 16, 2004).

In light of our determination that the evidence supported the trial court's finding that the respondent was unable to benefit from reunification services, we need not address the respondent's claim that, by substituting agencies, the department's reunification efforts violated the ADA and, therefore, that the trial court incorrectly concluded that the department's efforts were reasonable under § 17a-112 (j) (1). We nevertheless take this opportunity to clarify the ADA's role in child welfare proceedings given the apparent misapprehension of the respondent and the amici curiae that the ADA is inapplicable to child welfare proceedings merely because it cannot be raised as a defense in such proceedings. The respondent argues, for example, that, under our current law, "the ADA does not apply to child protection cases and, therefore, [can offer] no insight into what reunification efforts are reasonable . . . ." This assertion is simply not accurate.

As we previously noted, Title II, § 202, of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (2012). For purposes of the ADA, a " 'qualified individual with a disability' " is "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131 (2) (2012).

This court previously has explained that, "subsequent

to the passage of the ADA in 1990, the [General Assembly] amended . . . related statutes to strengthen protections for the disabled in accordance with the ADA itself. See Public Acts 2001, No. 01-28, § 9 [P.A. 01-28] (adding subsection [c] to General Statutes § 46a-77, requiring that state agencies comply with ADA to the same extent that it provides rights and protections for persons with physical or mental disabilities beyond those provided for by the laws of this state). . . . Public Act 01-28 . . . specifically engraft[ed] the requirements of the ADA, including reasonable accommodation, on state agencies." (Footnote omitted; internal quotation marks omitted.) *Curry* v. *Allan S. Goodman, Inc.*, 286 Conn. 390, 411–12, 944 A.2d 925 (2008). General Statutes § 46a-71 (a) further provides that the "services of every state agency shall be performed without discrimination based upon race, color, religious creed, sex, gender identity or expression, marital status, age, national origin, ancestry, intellectual disability, mental disability, learning disability or physical disability, including, but not limited to, blindness." Accordingly, it is the law of this state that child welfare proceedings are subject to the provisions of the ADA insofar as they involve the services, programs, or activities of any state agency.

This court has nonetheless explained, consistent with the view of the vast majority of courts that have addressed the issue,[16] that the ADA is not properly raised as a defense in a termination of parental rights or neglect proceeding because such an action is not a service, program, or activity of a state agency within the meaning of the ADA. See *In re Joseph W.*, 305 Conn. 633, 650–51, 46 A.3d 59 (2012). The ADA is not properly raised as a defense in such proceedings also because, as the Michigan Court of Appeals explained in *In re Terry*, supra, 240 Mich. App. 14, "[t]he focus at the dispositional hearing must be on the parent's rights to the child and the best interests of the child . . . and the parties and the court should not allow themselves to be distracted by arguments regarding the parent's rights under the ADA." Id., 26–27 n.5; see also *Adoption of Gregory*, 434 Mass. 117, 121, 747 N.E.2d 120 (2001) ("Although the [Massachusetts] [D]epartment [of Social Services] is a public entity and therefore subject to the ADA . . . nothing in the ADA suggests that a violation of the [ADA] would interfere with the right of the state to terminate parental rights. To allow the provisions of the ADA to constitute a defense to termination proceedings would improperly elevate the rights of the parent above those of the child." [Citation omitted; internal quotation marks omitted.]).

This is not to say that the ADA plays no role in child welfare proceedings. To the contrary, as §§ 46a-71 (a) and 46a-77 (c) make eminently clear, "the department is required, pursuant to § 17a-112 (c) (1) [and the ADA], to take into consideration [a parent's] mental condition

when determining what 'reasonable efforts' to make at reunification." *In re Antony B.*, 54 Conn. App. 463, 475, 735 A.2d 893 (1999). Accordingly, the fact that the ADA cannot be interposed as a defense in a termination proceeding "[does] not [mean] that the ADA does not apply to the reunification services and programs that the department must [provide] to meet the parents' specialized needs. . . . [Section] 17a-112 requires the department to make reasonable efforts at reunification. This includes taking the parent's mental condition into consideration. A failure to provide adequate services because of the parent's mental condition would violate not only § 17a-112, but [also] the ADA . . . ." (Citations omitted.) Id., 473 n.9; see also *In re Devon B.*, 264 Conn. 572, 583, 825 A.2d 127 (2003) ("the petitioner statutorily is obligated to effectuate the respondent's reunification with her child, and, in order to accomplish that obligation, the petitioner [must] address the respondent's . . . needs in light of her mental disability"); *In re Eden F.*, 250 Conn. 674, 708 n.35, 741 A.2d 873 (1999) ("any . . . bias [against parents with mental illness] would be intolerable, and vigilance must be exercised to ensure that the parental rights of mentally ill persons are afforded the full protections provided under our stringent [child protection] statutory scheme").

Furthermore, as a practical matter, under our statutory scheme, the department's failure to make reasonable modifications to its services, programs or activities to accommodate a parent's disability would likely preclude a finding under § 17a-112 (j) (1) that the department's reunification efforts were reasonable under the circumstances. Cf. *Lucy J.* v. *State, Dept. of Health & Social Services, Office of Children's Services*, 244 P.3d 1099, 1116 (Alaska 2010) ("if [the Alaska Office of Children's Services] fails to take into account the parents' limitations or disabilities and [to] make any reasonable accommodations, then it cannot be found that reasonable efforts were made to reunite the family" [internal quotation marks omitted]); *In re Hicks/Brown*, Mich. , 893 N.W.2d 637, 640 (2017) ("Absent reasonable modifications to the services or programs offered to a disabled parent, the [Michigan] Department [of Health and Human Services] has failed in its duty under the ADA to reasonably accommodate a disability. In turn, the [Michigan] Department [of Health and Human Services] has failed in its duty under the Probate Code to offer services designed to facilitate the child's return to his or her home . . . and has, therefore, failed in its duty to make reasonable efforts at reunification . . . ." [Citation omitted.]); *In re Hicks*, 315 Mich. App. 251, 269–70 n.5, 890 N.W.2d 696 (2016) ("[g]iven that the court must consider whether reasonable efforts were made to reunite the family, precluding specific reference to the ADA at the dispositional hearing is not likely to make any difference in terms of the outcome"), vacated in part on other grounds sub nom. *In re Hicks/*

*Brown*, ___ Mich. ___, 893 N.W.2d 637 (2017).

Our understanding of the interplay between the ADA and our child welfare statutes fully comports with the guidance recently issued by the United States Departments of Justice and Health and Human Services "to assist state and local child welfare agencies and courts to ensure that the welfare of children and families is protected in a manner that also protects the civil rights of parents . . . with disabilities." (Footnote omitted.) United States Dept. of Health and Human Services & United States Dept. of Justice, Protecting the Rights of Parents and Prospective Parents with Disabilities: Technical Assistance for State and Local Child Welfare Agencies and Courts under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act (August, 2015), available at https://www.ada.gov/doj_hhs_ta/child_welfare_ta.html (last visited August 3, 2017). That document provides in relevant part: "Individuals with disabilities must be provided opportunities to benefit from or participate in child welfare programs, services, and activities that are equal to those extended to individuals without disabilities. This principle can require the provision of aids, benefits, and services different from those provided to other parents . . . [when] necessary to ensure an equal opportunity to obtain the same result or gain the same benefit, such as family reunification.

"This does not mean lowering standards for individuals with disabilities; rather, in keeping with the requirements of individualized treatment, services must be adapted to meet the needs of a parent . . . who has a disability to provide meaningful and equal access to the benefit. In some cases, it may mean ensuring physical or programmatic accessibility or providing auxiliary aids and services to ensure adequate communication and participation, unless doing so would result in a fundamental alteration to the nature of the program or undue financial and administrative burden. For example, a child welfare agency must provide an interpreter for a father who is deaf when necessary to ensure that he can participate in all aspects of the child welfare interaction. In other instances, this may mean making reasonable modification to policies, procedures, or practices, unless doing so would result in a fundamental alteration to the nature of the program. For example, if a child welfare agency provides classes on feeding and bathing children and a mother with an intellectual disability needs a different method of instruction to learn the techniques, the agency should provide the mother with the method of teaching that she needs." (Footnotes omitted.) Id.

We therefore continue to encourage trial courts to look to the ADA for guidance in fashioning appropriate services for parents with disabilities. Furthermore, there is nothing in the record before us to suggest that

the trial court deviated in any way from ADA principles, which, as we have explained, are incorporated by reference into our state's own stringent antidiscrimination statutes, in adjudicating the neglect and termination petitions in the present case. To the contrary, the record reflects that the trial court was keenly aware of, and sensitive to, the respondent's intellectual deficits when it ordered specific steps to facilitate reunification. Although extremely unfortunate, in the end, those deficits, along with the respondent's psychological conditions, proved to be an insurmountable barrier to reunification.

The form of the judgment of the Appellate Court is improper, the judgment of the Appellate Court is vacated, and the case is remanded to that court with direction to affirm the judgment of the trial court.

In this opinion the other justices concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the full names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** The listing of justices reflects their seniority status on this court as of the date of oral argument.

*** August 9, 2017, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] "The [trial] court also terminated the parental rights of Elijah's putative father, Paul Y., during the same proceedings. Paul Y., however, did not challenge the [trial] court's judgment"; *In re Elijah C.*, 164 Conn. App. 518, 519 n.1, 137 A.3d 944 (2016); and, consequently, he is not a party to this appeal.

[2] We granted the respondent's petition for certification to appeal, limited to the following questions: First, "[d]id the Appellate Court incorrectly determine that the respondent's appeal should be dismissed as moot due to a lack of adequate briefing of her claim that the trial court incorrectly determined that she was unable to benefit from services?" *In re Elijah C.*, 321 Conn. 917, 136 A.3d 1275 (2016). Second, "[i]f the answer to the first question is in the affirmative, did the trial court correctly determine that the petitioner had made reasonable efforts and that the respondent was unable to benefit from reunification efforts?" Id.

[3] After this appeal was filed, we granted the applications of the Arc of the United States, the American Civil Liberties Union, the American Civil Liberties Union Foundation of Connecticut, and the Office of the Chief Public Defender for permission to file amicus curiae briefs in support of the respondent's claims.

[4] Elijah was born on February 15, 2014.

[5] "A finding of neglect is not necessarily predicated on actual harm . . . but can exist when there is a potential risk of neglect." (Internal quotation marks omitted.) *In re Elijah C.*, supra, 164 Conn. App. 520 n.2.

[6] General Statutes § 17a-112 provides in relevant part: "(a) In respect to any child in the custody of the Commissioner of Children and Families in accordance with section 46b-129 . . . the commissioner . . . may petition the court for the termination of parental rights with reference to such child. . . .

\* \* \*

"(j) The Superior Court, upon notice and hearing as provided in sections 45a-716 and 45a-717, may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that (1) the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent in accordance with subsection (a) of section 17a–111b, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts . . . ."

[7] "Prior to the commencement of the hearing on the termination petition, the respondent filed a motion to transfer guardianship to Gwendolyn C., the respondent's adoptive mother. The court denied this motion, and that

ruling was not challenged on appeal." *In re Elijah C.*, supra, 164 Conn. App. 521 n.3.

[8] General Statutes § 1-1g provides: "(a) Except as otherwise provided by statute, 'intellectual disability' means a significant limitation in intellectual functioning existing concurrently with deficits in adaptive behavior that originated during the developmental period before eighteen years of age.

"(b) As used in subsection (a) of this section, 'significant limitation in intellectual functioning' means an intelligence quotient more than two standard deviations below the mean as measured by tests of general intellectual functioning that are individualized, standardized and clinically and culturally appropriate to the individual; and 'adaptive behavior' means the effectiveness or degree with which an individual meets the standards of personal independence and social responsibility expected for the individual's age and cultural group as measured by tests that are individualized, standardized and clinically and culturally appropriate to the individual."

[9] The record reflects that two of the respondent's three weekly visits with Elijah were also supervised by department staff.

[10] Title II, § 202, of the ADA provides in relevant part that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." Americans with Disabilities Act of 1990, Pub. L. No. 101-336, 104 Stat. 337, codified at 42 U.S.C. § 12132 (2012). Title V, § 504, of the Rehabilitation Act of 1973 provides in relevant part that a qualified disabled person shall not "solely, by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794 (a) (2012).

[11] See footnote 6 of this opinion.

[12] For example, the respondent argued that, "because the department acted in opposition to [the court's earlier] order, the trial court's subsequent holding that the clear and convincing evidence showed that the petitioner made reasonable efforts and that the respondent was unable to benefit from [them] is clearly erroneous." *In re Elijah C.*, Conn. Appellate Court Briefs & Appendices, supra, Respondent's Brief p. 11. The respondent also argued that "[t]he trial court's eventual holding that the respondent was unable to benefit from services cannot stand if reasonable services were taken away from [her]." Id.

[13] Because the respondent reasonably viewed her first and second claims as inextricably linked, for purposes of the present case, it is not dispositive that the two claims were set forth in the same section of her brief. See *State* v. *Buhl*, supra, 321 Conn. 727 n.32 ("some claims may logically be combined under one heading"). We, however, strongly encourage litigants to raise each separate and independent claim under its own heading.

[14] In its January 28, 2015 memorandum of decision on the department's motion for review of the permanency plan, the trial court found in relevant part: "In compliance with final specific steps orders issued by this court at the time of the neglect judgment, [the department] contacted DDS and DMHAS about the existence of the type of supervised reunification facility described by the psychological evaluator. . . . The department was informed by representatives of those agencies that such a facility does not exist in this state. . . . [A department social worker also] testified credibly that she [was] unaware of any [department] funded residential program or facility in Connecticut where [the respondent] and Elijah could live together while the [respondent] received supervised parenting training and support."

[15] As the petitioner contends, the record indicates that the respondent had a history of rejecting the department's advice with respect to such matters. The trial court expressly stated in its memorandum of decision that, over the department's strong objections, the respondent decided to reside with Gwendolyn when she reached the age of majority, and, in doing so, she had abandoned the housing, educational and vocational services that the department had arranged for her. The respondent also continued to live with Gwendolyn throughout the neglect and termination proceedings, even though the trial court, early on in the proceedings, made it abundantly clear that reunification was not possible as long as the respondent resided in Gwendolyn's home.

Despite the trial court's ruling that Gwendolyn's home was not a suitable placement for Elijah, and knowing that there were no state programs that provided the level of care and supervision that she and Elijah required to achieve reunification, the respondent never once requested that the depart-

ment investigate an out-of-state placement. The respondent instead asked the court to reconsider its prior decision to deny Gwendolyn's motion to be Elijah's legal guardian, a request that the court flatly denied, citing, as reasons, Gwendolyn's "catastrophic . . . failures" as a parent, the "diabolically cruel" punishment she inflicted on her own children, and the " 'toxic and controlling' " relationship that existed between her and the respondent at the time of the termination proceedings.

[16] See, e.g., *People ex rel. T.B.*, 12 P.3d 1221, 1223 (Colo. App. 2000) ("the ADA cannot be raised as a defense to a termination of parental rights proceeding"); *In re Doe*, 100 Haw. 335, 340, 60 P.3d 285 (2002) ("a termination proceeding is not a 'service, program, or activity' within the definition of the ADA, and, consequently, the ADA does not apply to such proceedings"); *Adoption of Gregory*, 434 Mass. 117, 121, 747 N.E.2d 120 (2001) (proceedings to terminate parental rights are not " 'services, programs, or activities' " under ADA, and, thus, "the ADA is not a defense to such proceedings"); *In re Terry*, supra, 240 Mich. App. 24–25 ("[t]ermination of parental rights proceedings do not constitute 'services, programs or activities' [under the ADA, and, therefore] . . . a parent may not raise violations of the ADA as a defense to [such] proceedings"); *In re Kayla N.*, 900 A.2d 1202, 1208 (R.I. 2006) ("a termination-of-parental-rights proceeding does not constitute the sort of service, program, or activity that would be governed by the dictates of the ADA"), cert. denied sub nom. *Irving N.* v. *Rhode Island Dept. of Children, Youth, and Families*, 549 U.S. 1252, 127 S. Ct. 1372, 167 L. Ed. 2d 159 (2007); *In re B.S.*, 166 Vt. 345, 351–52, 693 A.2d 716 (1997) ("[T]he ADA does not directly apply to TPR proceedings. . . . TPR proceedings are not services, programs or activities within the meaning of [t]itle II of the ADA . . . ." [Citation omitted; internal quotation marks omitted.]); *In re Torrance P.*, 187 Wis. 2d 10, 16, 522 N.W.2d 243 (1994) (ADA claim "is not a basis to attack [a] TPR order").

To be sure, court proceedings may be services, programs, or activities within the meaning of the ADA in certain circumstances—for instance, insofar as they implicate the ADA's accessibility protections. Cases involving the ADA's application to such proceedings, however, invariably involve the need for reasonable accommodations, such as the removal of physical barriers to access. See, e.g., *Arneson* v. *Arneson*, 670 N.W.2d 904, 911 (S.D. 2003) ("[m]ost cases concerning the application of the ADA in court proceedings deal with reasonable courthouse accommodations"); *In re K.C.*, 362 P.3d 1248, 1251 (Utah 2015) (distinguishing between courthouse proceedings and termination of parental rights proceedings under ADA).

--------------------------------