******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

IN RE KATIA V.*
(AC 45026)

Moll, Clark and Vertefeuille, Js.

*Syllabus*

The respondent mother appealed to this court from the judgment of the trial court terminating her parental rights with respect to her minor child, who had been in foster care since birth. The trial court made the statutory (§ 17a-112 (j) (1)) findings that the Department of Children and Families had made reasonable efforts to reunify the mother with the child and that the mother was unable or unwilling to benefit from those efforts. The mother claimed that the department and the trial court violated her rights under the Americans with Disabilities Act of 1990 (ADA) (42 U.S.C. § 12101 et seq.) in determining that the department had made reasonable efforts at reunification, and that the court erred in denying her motions to bifurcate the adjudicatory and dispositional phases of the termination proceedings and to sequester the child's foster parents during trial. *Held*:

1. The respondent mother's challenge to the trial court's finding that the department had made reasonable efforts to reunify her with the child, which was based on her claim that the department and the court had violated her rights under the ADA, was moot; the mother failed to challenge the court's finding that she was unable or unwilling to benefit from the department's reunification efforts, and, because either finding is an independent basis to terminate parental rights, a review of her challenge to the finding that the department had made reasonable efforts to reunify her with the minor child could not have afforded her any practical relief.

2. The trial court did not abuse its discretion by denying the respondent mother's motion to bifurcate the proceedings: it was reasonable for the court to conclude that a unified trial was appropriate because two separate hearings would have undermined the court's interest in judicial economy, as well as the child's interest in the efficient resolution of the proceedings; moreover, there was nothing in the record to indicate that the court improperly considered dispositional evidence in the adjudicatory phase of the trial.

3. The trial court acted within its discretion in denying the respondent mother's motion to sequester the child's foster parents, the mother having failed to provide any basis for such a finding; the motion was neither specific nor supported by evidence, and it failed to establish a likelihood that the foster parents would testify falsely if they were not sequestered.

Argued May 16—officially released August 17, 2022**

*Procedural History*

Petition by the Commissioner of Children and Families to terminate the respondents' parental rights with respect to their minor child, brought to the Superior Court in the judicial district of Fairfield, Juvenile Matters at Bridgeport, and transferred to the judicial district of Litchfield, Juvenile Matters at Torrington; thereafter, the court, *Aaron, J.*, denied the respondent mother's motion to bifurcate the trial; subsequently, the case was tried to the court, *Hon. Barbara M. Quinn*, judge trial referee; thereafter, the court denied the respondent mother's motion to sequester certain witnesses; judgment terminating the respondents' parental rights, from which the respondent mother appealed to this court. *Affirmed.*

*Lisa M. Vincent*, with whom was *Ani A. Desilets*, for the appellant (respondent mother).

*Carolyn Signorelli*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, and *Evan O'Roark* and *Jammie Middleton*, assistant attorneys general, for the appellee (petitioner).

*Mark S. Weber*, for the minor child.

*Opinion*

VERTEFEUILLE, J. The respondent mother, Karen V., appeals from the judgment of the trial court terminating her parental rights with respect to her minor daughter, Katia V. (Katia). On appeal, the respondent claims that (1) the Department of Children and Families (department) and the court violated her rights under the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101 et seq. (2018), (2) the court erred by denying her motion to bifurcate the adjudicatory and dispositional portions of the termination proceedings, and (3) the court erred by denying her motion to sequester certain witnesses.[1] We affirm the judgment of the trial court.

The following facts, as found by the trial court, and procedural history are relevant to our resolution of the respondent's appeal. The respondent has four children. Katia is the youngest of the respondent's children, and she was born shortly after her three siblings had entered the custody of the petitioner, the Commissioner of Children and Families.

In 2014, after the respondent gave birth to twins—Katia's middle siblings—she hired a nanny to care for her three children while she was at work. The respondent "did no careful background check of [the] nanny, who had no prior education or experience with young children or in providing day care. Although [the respondent] had surveillance video cameras in her home, she only occasionally spot-checked [the] nanny's performance. . . . After [the] nanny had been in the house for about a year, in March, 2015, [the respondent's oldest child] presented at the end of one school day with a bad burn on her hands, which required medical care. Subsequent to securing treatment, [the respondent] decided to watch a whole block of time on the videotapes she had . . . [and] [s]he discovered to her horror that [the] nanny was physically abusing [her oldest child] throughout the day."

At this time, the department became involved with the family. "As [the department's] investigation continued, it came to light that [the respondent's oldest child] had earlier complained to [the respondent] about the nanny and her physical abuse. [The child] had visible bruises from time to time. Nonetheless, [the respondent] had not acted on [the] child's complaints but dismissed them. [The department] was very concerned about [the respondent's] ability to properly care for her children . . . [and] noted then that [she] was unable to openly admit or recognize the impact of these events on [her oldest child]. . . . Despite apparently understanding that the abuse had been severe, [the respondent] did not comply with the therapeutic case goals for [her oldest child's] treatment, which included her own participation and involvement in [the child's] treat-

ment." After this incident, the department paid for day care services for the respondent's three children. The department also referred the respondent's oldest child to individual counseling and the twins, at that time one year old, to Birth to Three services.

In September, 2015, the day care provider for the respondent's three children "reported [to the department] that [the respondent] cursed at the day care staff and also used vulgar language toward [her oldest child]." In July, 2016, the day care provider reported to the department that "the children attended day care disheveled, dirty and with a foul odor. Their play with each other was [also] seen to be violent, when they would be pulling each other's hair." In approximately September, 2016, another report was made to the department, this time "regarding physical neglect of [the respondent's oldest child]. [The child] was found in the woods behind [the respondent's] condominium by neighborhood children who told a nearby adult. [The child] was returned home by the police, and the department was informed. [The child] reported [that] she had left the home to go to the woods because [the respondent] had been upset and screaming in the house. [The child] had been gone some time, and no one came to look for her. [The department] came to learn that this was not the first time [the child], who was then just over five years old, had gone to the woods alone. [The child] apparently had at least been tacitly permitted to go to the woods behind the condo without adult supervision previously."

In 2016, the department removed the respondent's three oldest children from her care "due to physical neglect and placed them together in foster care. [The department found that the respondent] suffered from unaddressed mental health needs. Those unaddressed needs made her unable to be a competent and safe caretaker for her young children, [the department] alleged.

"Katia . . . was born over a month later. Due to ongoing concerns about [the respondent's] caretaking ability, [the department] removed [Katia] from the hospital at the time of her birth on the ground of predictive neglect and placed her in a nonrelative foster home apart from the [respondent's] three oldest children." Katia was removed from the care of the respondent pursuant to a court order of temporary custody and was adjudicated neglected.

"At the time Katia came into [foster] care, specific steps were ordered by the court for [the respondent's] rehabilitation. . . . There were two main areas of concern: first, [the respondent's] mental health, [specifically] her debilitating depression, and, second, her resulting inability to be present in the moment for her children to attend to their needs. The specific steps required [the respondent] to take part in counseling and

make progress toward the identified treatment goals." (Footnote omitted.) The respondent was also "evaluated multiple times throughout the course of these lengthy proceedings."

In 2016, the respondent completed an eight week parenting course. The first evaluation of the respondent was also completed in 2016, when none of her children was in her care. This evaluation stated that the respondent "was generally good with her children, was a good person and smart." It further stated that, although "[the respondent] wanted to do everything for her children . . . her depression interfered with her ability to parent."

"[The respondent] began her mental health services with a therapist in October, 2016, with whom she remained in treatment until April, 2017. [The respondent] then objected to the fact that [the therapist] reported her general progress to the [department], as he was required to do to demonstrate her compliance with services and her specific steps. [The respondent's] therapist testified to the treatment he provided. He believe[d] [that] he and [the respondent] had made some progress during the time of their sessions. When questioned about [whether] or not [the respondent's] depression resulted from her trauma in seeing her children abused by their first nanny and [the department's] involvement in her life, his answer was unequivocal. Such adult situational difficulties could not have caused her deep-seated depression, in his opinion. Only unaddressed childhood trauma could have such a negative impact on her functioning. Addressing it adequately, he believed, would take considerable work, which [the respondent] had not yet begun. As time went on, the evidence reveals, [the respondent] was never able to address the underlying causes of her depression, which she remained unwilling to disclose." (Footnote omitted.)

In March, 2017, the respondent completed a "parenting services" program. Upon the respondent's completion of the program, "there was no recommendation for [the respondent] to reunify with her children."

The respondent received treatment from a second therapist from April, 2017, until December, 2017. This therapist "continued the work of [the respondent's] previous therapist in helping [her] to better understand her own childhood experiences and how they connected to her parenting. In addition, one of the therapeutic goals was to help [the respondent] better regulate her emotions, develop awareness of them and employ coping skills for events that proved difficult for her to navigate. [The respondent] also ultimately ended these services, as she felt that the second therapist was too focused on children."

The second and third evaluations of the respondent

took place on July 11 and 26, 2017, while she was under the care of her second therapist. The second evaluation stated that "[the respondent] was intelligent, had good common sense and reasoning, was resourceful, and open to new experiences. It was likely that she had a history of emotional trauma, considering her parents' divorce, her estranged relationship with her brother and her parents' inability to demonstrate affection." The second evaluation concluded that "all of this could have negatively contributed to [the respondent's] problems with emotional attachments." The third evaluation was conducted by court order for the purpose of gaining "a better understanding of [the respondent's] mental health and possible treatment needs." In this evaluation, it was noted that the respondent has been diagnosed with "[u]nspecified [t]rauma" and "[s]tressor [r]elated [d]isorder." The report further noted that the respondent "has a dissociated quality about her that is likely due to her unknown trauma. She also [has] [a]voidant [personality] disorder, which . . . resulted in [the respondent's] having difficulty accepting responsibility for her role in the children's being removed [from her care]." (Internal quotation marks omitted.)

The fourth evaluation of the respondent took place in March, 2018. In this evaluation, it was noted that "[the respondent's] affect was incongruent with what she was saying, such as praising her children but not smiling or having the appropriate tone of voice. Overall, [the respondent] struggled in processing the emotional needs of her children when they were all together. She had difficulty in keeping them integrated and engaged." This evaluation concluded that the respondent "needed to receive individual therapy with a focus on exploring how she perceived her role as a parent and her own abilities to effectively parent her children. She needed to demonstrate her ability to nurture, structure engagement and meet challenges with all of her children in therapeutic and in natural settings. She needed to be able to identify and resolve barriers to demonstrating the above domains and interactions."

In June, 2018, "Katia and [the respondent] began to work on Katia's attachment to [the respondent] through [a] provider [who assisted] in that work and help[ed] [the respondent] in reading Katia's nonverbal cues. During the summer of 2018, [the respondent's oldest child's] commitment to [the department] was revoked and [one] year of protective supervision was ordered for this child, as she returned home. It was around [this] time that [the department] heard from the provider assisting Katia and [the respondent] that there were concerns about supervision during visits and [the respondent's] poor mental health. In August, 2018, the unsupervised visitation [that the respondent] had with her three younger children was suspended [because the respondent] had left Katia unattended. That unsupervised visitation began again in November of 2018. . . .

"When [the department] filed a permanency plan seeking termination of [the respondent's parental] rights [as] to Katia, further contested litigation ensued with an agreement reached in court [on] May 30, 2019. . . . A crucial provision [of the agreement] was that, over the next six months, a reunification service provider would work diligently with [the department] and [the respondent] to facilitate the reunification of [the respondent's twins] and Katia with [the respondent]. . . . Although the plan was for the twins to be returned to [the respondent] before the start of school that year, they were returned shortly thereafter as problems continued to surface. In November, 2019, [the] commitment [of the twins] to [the department] was revoked with protective supervision ordered. In the meantime, although there had been unsupervised and overnight visitation with Katia, the lack of an attachment between [the respondent] and [Katia] continued to be troublesome to the reunification and visitation supervisors." (Footnote omitted.)

In late 2019, "a higher level of services for the family was recommended. It was to include family therapy for [the respondent] and her twins, as they had been out of [the respondent's] home for three years upon their return. [The respondent] categorically rejected those services and sought her own family therapy, although [the department] was never able to learn about [it because the respondent] would not sign releases for the information. New services were [also] provided for Katia's and [the respondent's] reunification . . . [but the respondent was] convinced that [the department] deliberately sabotaged her reunification with Katia at this juncture and did not comply with the May court agreement. . . . [The department] determined that Katia and [the respondent] were not ready for reunification . . . [because there was a] lack of attachment between [them that represented] a significant barrier to reunification. [The department] believed that proceeding without additional attachment work between [the respondent] and [Katia] would result in reunification failure and further frustration for [the respondent]. [The department] recommended an additional readiness assessment and, after that had been performed, for the reunification work to begin if that was the recommendation. Four sessions were scheduled for that purpose. . . . [The respondent, however] refus[ed] to cooperate with [the] continued . . . efforts [of the department]. . . .

"Given [the respondent's refusal], the new program was canceled entirely and another program called Theraplay began. This program was designed to assist [the respondent] in forming an attachment with Katia, learning how to pick up on her cues and respond to those cues. The visitation between [the respondent] and Katia was supervised once a week, and there was a second

Saturday visit with two hours for each such visit per week. [The respondent] made it clear that she was not going to accept [the department's] supervising the visits, so another service . . . was located to provide [supervision]." The individuals who supervised these visits noted the respondent's "ongoing difficulty [in] connect[ing] with [Katia], and Katia's resistance to all of [the respondent's] overtures, which were often in themselves distant, inconsistent and not adequately reciprocal. Katia often rejected [the respondent's] attempts at affection and was unwilling to accept them. She would become rigid when they were offered and turn her head away. She would not respond when [the respondent] told her at the end of visits how much she loved her." It was also noted that "there was not a lot of effort made by [the respondent] to engage Katia directly, and attention and praise did not come naturally to her." It was further noted that the respondent's home was an environment that was difficult to manage and chaotic, and that the respondent "was passive during the visits when all four children were present, and she struggled with being assertive."

A fifth evaluation of the respondent was completed in April, 2020. This evaluation concluded that the respondent "continued to have significant clinical depression . . . which persisted, despite . . . the passage of more than four years after Katia was removed from her care in 2016, [and] all of the treatment and support that she had received." This evaluation also found that the respondent's "lack of energy and engagement impacted her ability to parent adequately and, in particular, to parent a young child such as Katia who required structure and engagement."

The respondent began working with a third therapist, with whom she was still working at the time of trial. The respondent's third therapist testified at trial that the respondent "is provided with certain medications for management of her mood, which he oversees. As a result of recommendations in April, 2020, by . . . the court-appointed psychologist evaluator, he has been providing [the respondent with] cognitive behavioral therapy. The objectives in [the respondent's] treatment with [her third therapist] continue to include identifying issues and cognitive distortions, learning coping skills to reduce trauma, taking medications and learning to effectively manage the symptoms of anxiety and depression associated with trauma."

In addition to the evaluations of the respondent, an evaluation of Katia was also conducted. This evaluation was completed on October 15, 2020, and concluded that "it seems unlikely that [the respondent] could provide what Katia needs in order to successfully transfer her attachment from the foster home to [the respondent's] home if the court decides to reunify Katia with [the respondent]. [The respondent] would need to be open

and accepting to input without defensiveness from and about the foster home as well as other professionals. Significant levels of intervention and guidance would be required to facilitate the possibility of a positive developmental trajectory for Katia. Such openness and acceptance of the opinions of others, including professional service providers, has been lacking in the long years of [the respondent's] involvement with [the department]. . . . [The respondent's] ongoing inability to accept any contrary input about her own preconceived opinions and positions has significantly inhibited her ability to make the positive changes needed for Katia's benefit and possible reunification . . . ."

On December 11, 2020, the petitioner filed a petition for the termination of the respondent's parental rights with respect to Katia pursuant to General Statutes § 17a-112. The petitioner alleged that the statutory grounds for termination were that, pursuant to § 17a-112 (j), Katia had been found in a prior proceeding to have been neglected, abused or uncared for, and that the respondent had failed to achieve the degree of personal rehabilitation that would encourage the belief that, within a reasonable time, considering the age and needs of Katia, the respondent could assume a responsible position in Katia's life.

On March 4, 2021, the respondent filed a motion to bifurcate the adjudicatory and dispositional portions of the proceedings. The respondent's motion was denied by the court, and a unified trial began on March 7, 2021. On March 29, 2021, the respondent filed a motion to sequester witnesses, wherein she sought to have Katia's foster parents "precluded from being present at court during the consolidated termination of parental rights trial." On April 7, 2021, the court denied the respondent's motion.

After the conclusion of the trial, the court issued a detailed, comprehensive memorandum of decision in which it concluded, based on the factual findings set forth previously in this opinion, that the petitioner had established the alleged grounds for termination. In reaching this conclusion, the court found that (1) the department had made reasonable efforts to reunify the respondent with Katia, and (2) the respondent was unable or unwilling to benefit from reunification efforts. Specifically, the court found that the efforts that the department had made to reunify Katia with the respondent were "extraordinary and continued with modifications and attempts to engage her over many years. They included, in summary, case management services, visitation with Katia, mental health and substance abuse services, counseling to assist her in overcoming her barriers to reunification as well as medication to manage the debilitating symptoms of her clinical depression, which defeated [her] parenting efforts. The details of those services demonstrate the lengths to which [the

department] went to secure relevant, timely and targeted services for [the respondent]." (Footnote omitted.) The court further found that the respondent was unwilling or unable to benefit from reunification services despite the efforts of the department because the respondent "was never able to address adequately either her mental health needs or develop the necessary parenting skills to appropriately parent Katia." Additionally, the court determined that it was in the best interests of Katia to terminate the parental rights of the respondent because the respondent, "despite more than four years of services and parenting training, had been unable to form an attachment to her and cannot provide her with the care, structure and nurturing that she requires to be able to thrive and prosper."

The respondent appealed to this court. Additional facts and procedural history will be set forth as necessary.

I

The respondent first claims that the department and the court violated her rights under the ADA. Specifically, the respondent challenges the court's finding that the department had made reasonable efforts to reunify her with Katia pursuant to § 17a-112 (j) (1) on the ground that her rights under the ADA were violated because (1) the court "illegally devalued her use of a highly trained service animal to address symptoms of her lifelong depression," (2) the court issued a decision that "illegally required [her] to 'disclose' and 'address' some unidentified, underlying cause of her mental health disability as a prerequisite to reunification," (3) the court "allowed the [department] to introduce [its] social study as proof of mental health unfitness and relied upon it," (4) the department "never provided any actual opportunity [for her] to reunify with [Katia]," (5) the department "failed to accommodate the unique needs of the [respondent] or [Katia] in the structure, frequency, and duration of visitation," and (6) the court "failed to fairly consider [her] evidence of the foregoing." In response, the petitioner argues, inter alia, that the respondent's first claim is moot and not justiciable because she "fail[ed] to challenge the second, independent basis for satisfying § 17a-112 (j) (1), namely, the fact that she was unable or unwilling to benefit from reunification efforts," and that failure alone is sufficient to warrant the termination of the respondent's parental rights. We agree with the petitioner.

We begin by setting forth the applicable standard of review and relevant legal principles. "The question of mootness implicates the subject matter jurisdiction of this court and thus may be raised at any time . . . . Mootness is a question of justiciability that must be determined as a threshold matter because it implicates [this] court's subject matter jurisdiction . . . . Because courts are established to resolve actual contro-

versies, before a claimed controversy is entitled to a resolution on the merits it must be justiciable. . . . A case is considered moot if [the] court cannot grant the appellant any practical relief through its disposition of the merits . . . . In determining mootness, the dispositive question is whether a successful appeal would benefit the plaintiff or defendant in any way. . . . Our review of the question of mootness is plenary." (Citations omitted; internal quotation marks omitted.) *Wozniak* v. *Colchester*, 193 Conn. App. 842, 853, 220 A.3d 132, cert. denied, 334 Conn. 906, 220 A.3d 37 (2019).

"[A]s part of a termination of parental rights proceeding, § 17a-112 (j) (1) requires the department to prove by clear and convincing evidence that it has made reasonable efforts to locate the parent and reunify the child with the parent, unless the court finds . . . that the parent is unable or unwilling to benefit from reunification efforts . . . . Because the two clauses are separated by the word unless, [§ 17a-112 (j) (1)] plainly is written in the conjunctive. Accordingly, the department must prove either that it has made reasonable efforts to reunify or, alternatively, that [the respondent] is unwilling or unable to benefit from reunification efforts. Section 17a-112 (j) clearly provides that the department is not required to prove both circumstances. Rather, either showing is sufficient to satisfy this statutory element. . . .

"Accordingly . . . when . . . the trial court finds that the department has proven both statutory elements—the department made reasonable reunification efforts and the respondent was unable to benefit from them—the respondent's failure to challenge both findings on appeal renders the appeal moot because either one constitutes an independent, alternative basis for affirming the trial court's judgment." (Citation omitted; footnote omitted; internal quotation marks omitted.) *In re Elijah C.*, 326 Conn. 480, 493–94, 165 A.3d 1149 (2017).

In the present case, the court concluded in its memorandum of decision that (1) the department had made reasonable efforts to reunify the respondent with Katia, and (2) the respondent was unable or unwilling to benefit from reunification efforts. On appeal, however, the respondent has challenged only the finding of the trial court that the department had made reasonable efforts to reunify her with Katia. The respondent, therefore, has failed to challenge the second, independent basis for satisfying § 17a-112 (j) (1)—that she was unable or unwilling to benefit from reunification efforts. This fact is determinative in the disposition of this appeal. Therefore, because the respondent in the present case has failed to challenge the finding of the court that she was unable or unwilling to benefit from reunification efforts, we conclude that her claim is moot.

II

The respondent next claims that the court erred by denying her motion to bifurcate the proceedings because it "conflat[ed] the statutory grounds of failure to rehabilitate and no ongoing parent-child bond . . . ." In response, the petitioner argues that the court did not abuse its discretion because "there were sound reasons for the court to hear the evidence on the dispositional and adjudicatory phases together instead of bifurcating them." We agree with the petitioner.

On March 4, 2021, the respondent filed a motion to bifurcate, claiming that "[t]here is an unusual and significant risk of prejudice to the [respondent] if the adjudicatory and dispositional portions of the trial are not bifurcated." The respondent's motion was denied by the court, and a unified trial began on March 7, 2021. The respondent claims on appeal that "[t]he denial of [her] motion to bifurcate constituted an abuse of discretion which [prevented her] from obtaining a fair trial . . . ." Specifically, the respondent argues that the court "improperly considered dispositional issues in the adjudicatory phase." We disagree.

We begin with the applicable legal principles and standard of review. "A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child. . . . A petition to terminate parental rights consists of two phases. . . . It is not necessary, however, that the two phases be the subject of separate hearings. One unified trial . . . is permissible. . . .

"Our standard of review of a court's decision to bifurcate a termination of parental rights hearing is well settled. The decision whether to bifurcate a termination of parental rights proceeding lies solely within the discretion of the trial court. . . . In reviewing claims that the trial court abused its discretion the unquestioned rule is that great weight is due to the action of the trial court and every reasonable presumption should be given in favor of its correctness; the ultimate issue is whether the court could reasonably conclude as it did . . . ." (Citations omitted; internal quotation marks omitted.) *In re Deana E.*, 61 Conn. App. 197, 204–205, 763 A.2d 45 (2000), cert. denied, 255 Conn. 941, 768 A.2d 949 (2001); see also Practice Book § 35a-7 (b).

In the present case, in light of our review of the record, we conclude that there is no basis to support a finding that the court abused its discretion by denying the respondent's motion to bifurcate and conducting

a unified hearing. It was reasonable for the court to conclude that a unified trial was appropriate because two separate hearings would have undermined the court's interest in judicial economy, as well as Katia's interest in the efficient resolution of these proceedings. Moreover, there is nothing in the record to indicate that the court improperly considered dispositional evidence in the adjudicatory phase. Therefore, we conclude that the court did not abuse its discretion by denying the motion to bifurcate.

## III

The respondent's final claim is that the court erred by denying her motion to sequester certain witnesses during the trial. We disagree.

Prior to trial, the respondent filed a motion to sequester, wherein she sought to have Katia's foster parents "precluded from being present at court during the consolidated termination of parental rights trial . . . ." In the motion, the respondent stated that she intended to call the foster parents as witnesses and argued that "it would be prejudicial to her case to have [them] participate in [the] trial." Specifically, the respondent argued that the presence of the foster parents at the trial would be prejudicial because (1) "she [did] not consent to their receipt of any confidential information about her own physical, mental or emotional health or well-being," and (2) they may receive "information to which they are not already privy." On April 7, 2021, the court denied the respondent's motion.

We next set forth the applicable standard of review and relevant legal principles. "[T]ermination of parental rights cases are juvenile proceedings . . . that constitute a civil inquiry. . . . In a civil proceeding, a court has the discretion to sequester any witness, including a party, if (1) seasonably requested, (2) specific and supported by sound reasons, and (3) false corroboration would probably result." (Citations omitted; internal quotation marks omitted.) *In re Christopher A.*, 22 Conn. App. 656, 663, 578 A.2d 1092 (1990); see also *State* v. *Pikul*, 150 Conn. 195, 201, 187 A.2d 442 (1962). "Sequestration of witnesses . . . is not demandable as a right, but rests in the discretion of the trial court. . . . The court's action is subject to review and reversal for abuse of discretion. . . . In reviewing whether there was an abuse of discretion, every reasonable presumption in favor of the trial court's ruling must be made." (Citation omitted; internal quotation marks omitted.) *Cirinna* v. *Kosciuszkiewicz*, 139 Conn. App. 813, 825, 57 A.3d 837 (2012).

In the present case, the respondent argues that the court abused its discretion by denying her motion to sequester Katia's foster parents because she had established, at the time the motion was heard, that there was a reasonable probability that they would (1) "falsely

corroborate what some other witnesses testified to," and (2) testify falsely based on "all of the protected health and private information about [her] . . . ." The respondent, however, did not provide any support or evidence for her motion beyond these bald claims. As previously set forth, the court *may* sequester a witness if the request is specific and supported by sound evidence and it is likely that false corroboration will result. See *In re Christopher A.*, supra, 22 Conn. App. 663. In light of our review of the record, we find that there is no basis for concluding that the court abused its discretion by denying the respondent's motion to sequester because the respondent failed to provide any basis for such a finding. The respondent's motion was neither specific nor supported by evidence. It failed to establish a likelihood that the foster parents would testify falsely if they were not sequestered. Therefore, we conclude that the court acted within its discretion in denying the respondent's motion to sequester.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** August 17, 2022, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The respondent also claims that the court erred in failing to sequester counsel for the foster parents, but this claim is not adequately addressed in the respondent's briefs and we deem it abandoned. See *C. B.* v. *S. B.*, 211 Conn. App. 628, 630, 273 A.3d 271 (2022) ("Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [When] a claim is asserted in the statement of issues but thereafter receives only cursory attention in the brief without substantive discussion or citation of authorities, it is deemed to be abandoned." (Internal quotation marks omitted.)).